WENDELL R. GUY v. WESTERN NEWSPAPER UNION.[1]

February 8, 1952.

No. 35,596.

---

[1] Reported in 55 N. W. (2d) 298.

*Samuel P. Halpern* and *James E. Gottlieb,* for appellant.

*C. E. Warner, Faegre & Benson, Paul J. McGough,* and *G. Alan Cunningham,* for respondent.

LORING, CHIEF JUSTICE.

In an action to recover damages for personal injuries, the court directed a verdict for defendant. Plaintiff moved for a new trial and appealed from the trial court's denial of his motion.

The accident happened about three o'clock in the afternoon of January 12, 1949, a "half-sunshiny" day, with the temperature around freezing. Plaintiff had gone to defendant's place of business on the west side of Chicago avenue, Minneapolis, to purchase supplies.

In front of the building was an entrance door, over which was a sign bearing defendant's name, Western Newspaper Union. A short distance from the entrance door were two large doors with a threshold (a loading platform) approximately four feet above the sidewalk. Plaintiff had never before been in the building. He entered through the entrance door and went into defendant's office, from where defendant's salesman conducted him to a stockroom. Here, plaintiff purchased five lengths of wood called "printer's furniture" and three sets of metal locking keys. To reach the stockroom, plaintiff passed through five doors altogether.

With the keys in his pocket and carrying the wood in his left hand, plaintiff accompanied the salesman to a wrapping counter, which was around the corner from the entrance to the office. Here, pointing toward the front of the building, plaintiff asked the salesman if he could get out that way. The salesman told him that he could. Plaintiff then proceeded past a door on his left (which would have taken him to the door through which he had entered) and went straight ahead to the two large double doors. The south half of the doors had to be opened before the other half because it overlapped the north half. There was no knob (such as is usually

found on exit doors) on either half; but plaintiff pulled a cord or chain, which hung down from a catch at the top. When the catch was released, the door swung open toward the inside, assisted, in part, by the wind. In plaintiff's own words:

"* * * I turned with my left side toward the outside and turned completely around, so in doing so I had my back to the outside and in the act of closing the door I fell."

He said that he was backing out as he fell the four feet from the threshold to the sidewalk. On the trial, plaintiff offered the following testimony as an explanation of his backing out of a strange door: ·

"* * * that the reason he proceeded to exit in the manner in which he did with his back to the east was that his left hand was holding the printer's furniture and could not be used and the right hand was holding the edge of the south door which he was attempting to close and that was the only manner in which he could exit under the circumstances."

The trial court held this testimony to be inadmissible; but, even if it had been admitted, no jury reasonably could have concluded that plaintiff was using due care. He had recognized that the doors were not the ordinary exit-entrance doors.[2] Being in a strange place when he saw these doors, which had no ordinary knob and were opened by pulling a cord attached to a catch, a reasonably prudent man should have been forewarned to look before backing out through them. Since the doors opened inwardly, looking offered no difficulty; and, since it was a reasonably bright day and the doors opened to the outside, the jury could have found only that if plaintiff had looked he would have seen the drop. His backing

---

[2]He testified that they looked like garage doors. The photograph repro-.duced here shows that they looked like just what they were—doors to a loading platform. (It should be noted that the boxes and crates obstructing the doors, as shown in the photograph, were not present at the time of the accident, and the picture is not authority that there was a handle on the south door at that time.) Nevertheless, plaintiff's statement shows that he recognized the fact that they were not ordinary doors.

through the doors without looking, in view of the warning given by the construction of the doors themselves, was contributory negligence as a matter of law.[3]

In view of this conclusion, other assignments of error need not be considered.

Order affirmed.

### AFTER REARGUMENT.

On July 11, 1952, the following opinion was filed:

PER CURIAM.

Upon rehearing and after further consideration of the facts and the law applicable, we are of the opinion that the conclusions reached in our original opinion are correct and should be adhered to.

In the original opinion, we quoted verbatim part of the testimony given by plaintiff. We wish to add the following:

"Well, I proceeded to door No. 3 and noticed that the south one of those doors did not have any handle on it and that particular door had to be opened before the other one opened so naturally I had to open that door which was done by releasing a catch at the top by a string hanging down in front of the door.

\* \* \* \* \*

"In the act of trying to get the door open I took ahold of the handle and it is the same type as a garage door that is, had catches at the top and one door has to open before the other door will open.

\* \* \* \* \*

"* * * my attention at that time was focused on how to get that particular door open and upon pulling, releasing the latch at the top of the door there was enough wind that the door opened itself; I didn't have to pull it open the door came open and I turned with my left side toward the outside and turned completely around,

---

[3]The parties cite many cases in which the question of contributory negligence was considered. However, this being a fact question, each case must be determined by its own particular circumstances. Sartori v. Capitol City Lodge, 212 Minn. 538, 4 N. W. (2d) 339; Speck v. N. P. Ry. Co. 108 Minn. 435, 122 N. W. 497, 24 L.R.A.(N.S.) 249, 17 Ann. Cas. 460.

so in doing so I had my back to the outside and in the act of closing the door I fell.

\* \* \* \* \*

"\* \* \* I pivoted while I was in the act of closing the door.

\* \* \* \* \*

"\* \* \* there was enough wind blowing that both the doors opened, door No. 2 I would say opened well, roughly maybe a foot to 18 inches.

\* \* \* \* \*

"\* \* \* the south one of the doors No. 3 was the door which I was interested in opening to get out, and in the act of opening that door I changed my location from this cord to this part of the door here and proceeded to pull it to me and in the act of pulling it I, at the same time I was pulling the door to close it, I slipped and fell.

"Q. With your back to the outside?

"A. That's right.

\* \* \* \* \*

"As the door opened I turned my body through the opening—

\* \* \* \* \*

"—facing the south and then pivoting right in the door opening.

\* \* \* \* \*

"\* \* \* and turned around until I faced the west, and had hold of the door with this hand—

\* \* \* \* \*

"My right hand and pulled the door closed, as it came closed I moved out of the way of the door as it closed.

"Q. In other words, you were backing east as you moved away from the door?

"A. Yes.

\* \* \* \* \*

"\* \* \* I moved the right foot out of the way of the door as it closed and when I placed that right foot, that is when I attempted

to place it after moving it from a position of where it obstructed closing the door there was nothing there to put it on.

\* \* \* \* \*

"Q. Now, during all this time when the south half of the door was opened that 2 feet and while you were attempting to close that door you were standing out in broad daylight?

"A. Approximately like this.

"Q. My question is, you were standing out in broad daylight?

"A. Yes, I was.

\* \* \* \* \*

"The only thing that distracted my attention was closing the door.

\* \* \* \* \*

"I didn't know there wasn't a handle on the outside of the door until I was in the act of closing it, I had to take hold of the door here.

\* \* \* \* \*

"Q. You went through the door as you have told us and in backing out into broad daylight you were putting your foot, your right foot backwards and there was nothing to support your foot and that caused you to fall, \* \* \*—

\* \* \* \* \*

"That caused me to fall, yes."

Plaintiff recognized the unusual nature of the doorway and should have understood that some greater care was required of him. It was an unusual exit door, from a business building, in surroundings strange to him. He should have at least considered the possibility of steps leading down from the doorway—a condition which would make it dangerous to pass through the door backward into an unknown place. When he discovered that there was no handle on the outside of the door, he had a further indication that he might not be able to proceed safely without looking. This is not a case where plaintiff was not warned of a hazard which was hidden and completely unexpected. It is a case where plaintiff failed in open daylight to discern a completely obvious hazard, easily discoverable by the exercise of the slightest watchfulness. We have

no doubt of the propriety of the court's action in directing a verdict for defendant in this case.

Plaintiff relies on Folsom v. Hojny, 223 Minn. 223, 26 N. W. (2d) 219, and Gordon v. Freeman, 193 Minn. 97, 258 N. W. 19. These cases are not inconsistent with the result here reached. In the Folsom case, plaintiff was a merchandise deliveryman. He was not familiar with the premises. Defendant's bartender instructed him to take in the merchandise and arrange it on the back bar. Plaintiff walked behind the front bar to do so and fell into an open trap door. When a person is informed by one who is near to a dangerous situation and in charge of the premises that he may use a particular route in delivering merchandise, he may reasonably assume that the one in charge of the premises knows of the dangerous condition and will warn of a condition as obviously and usually hazardous as an open trap door in an area which is so poorly lighted that ordinary watchfulness might not disclose its presence. That was the situation in the Folsom case, and we held that under such circumstances the issue of contributory negligence was for the jury. In the Gordon case, we held that the question of contributory negligence was properly submitted to the jury on the basis that plaintiff could reasonably suppose that defendant would warn her of the presence of a grease pit in a dark place along the route which she had been directed to follow when ordinary watchfulness would not disclose its presence.

Order affirmed.

Mr. Justice Christianson took no part in the consideration or decision of this case.